IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Hygienic Pigging Systems Ltd., | : | Case No. 1:10-CV-139 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER DENYING DEFENDANTS' |
| | : | MOTION FOR PARTIAL SUMMARY |
| O'Connor, *et al.*, | : | JUDGMENT |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

This matter is before the Court on the Motion for Partial Summary Judgment of Defendants/Counterclaim Plaintiffs Neil J. O'Connor ("O'Connor") and Process Pigging Systems, LLC ("PPS"), and Intervenor Defendant/Counterclaim Plaintiff Packaging Machinery Resources, LLC ("PMR") (collectively, "Defendants") (doc. 27). For the reasons that follow, the motion is **DENIED**.

**I.      BACKGROUND**

A.      Factual History

Defendants did not file a Statement of Proposed Undisputed Facts, as required by the Court's Standing Order Governing Civil Motions for Summary Judgment ("Standing Order").[1] For purposes of this Order only, the Court gleans the following facts from the Complaint (doc. 1), Defendants' First Amended Counterclaims (doc. 18) and the parties' briefing on the pending motion (docs. 27-29).

---

[1]The Standing Order is available at "Judge Susan J. Dlott-Forms and Procedures," http://www.ohsd.uscourts.gov/judges/dlott/Standard%20Order.pdf.

Hygienic Pigging Systems Ltd. ("HPS") is a UK company that specializes in the development, production, installation, and maintenance of pigging systems. (Doc. 1 at 2.) "Pigging" refers to the process of pushing a silicon projectile (the "pig") through a pipeline to reduce product waste from the pipeline's interior surface. (*Id*.) HPS is a world leader in providing pigging solutions for liquid process companies, including General Mills, Nestle, Kraft Foods, Heinz, Sara Lee, Coca-Cola, Colgate-Palmolive, and Procter & Gamble. (*Id*.)

O'Connor is a principal of both PPS and PMR. (Doc. 30-1 at 3.) On January 29, 2004, O'Connor, on behalf of PMR, entered into a Sales & Marketing Agency Agreement (the "2004 Agreement")[2] with HPS. (Doc. 18 at 1.) Pursuant to the 2004 Agreement, PMR agreed to sell and market HPS's products and services throughout the United States. (Doc. 27 at 4.) The 2004 Agreement set commission rates as follows:

> **5. Commission and Payment**
>
> a. <u>Payment</u>. The Agent's commission will be obtained from the Price the Agent negotiates with the buyer of the Products (the "Buyer"). Principal shall pay the commissions in U.S. Dollars on or about the fifteenth (15th) day of each month for payments received by the tenth (10th) day of that month. Payment received after that day will be part of the next commission period.
>
> b. <u>Commissions Paid During the Initial Term</u>. During the Initial Term and any Renewal Term, the commission rate will be set at twenty percent (20%) of the Price.

(*Id*. at 3.) "Price" is defined as "[p]rices and quotations." (Doc. 28-3 at 3.)

As to the term, the 2004 Agreement states:

> **15. Term of Contract**

---

[2] A legible copy of the 2004 Agreement is filed at doc. 28-3.

> Subject to the termination provisions contained in this Agreement, this Agreement commences on the date of signing and continues for an initial period of twelve **(12)** months. If the Agent has in all material respects observed the terms and conditions and met the agreed sales targets set forth in Appendix 2, the Principal will grant automatic renewal under the terms defined with exclusive rights defined herein for a further term with such modifications as may be reasonably required to the terms and conditions by the Principal as a result of its experience during the Initial twelve **(12)** month period.

(Doc. 28-3 at 5.) The 2004 Agreement refers to a "Renewal Term" in an earlier provision:

> If the sales targets set forth in Appendix 2 are met for the Initial Term the Principal will offer the Agent a second contract term of twelve **(12)** months (the "Renewal Term").

(*Id*. at 2.)

In 2005, HPS drafted and presented to O'Connor a Memorandum and a second Sales and Marketing Agency Agreement. (*See* Docs. 27-4 and 27-5.) The Memorandum was "written to provide guidelines for US Agency and Agency representation to [HPS]." (Doc. 27-4 at 3.) The Memorandum provides: "From January 1st 2005 Neil O'Connor, HPS US,[3] will have an exclusive sales range across all US States for the provision of HPS UK Products and Services." (*Id*.) As to commissions, the Memorandum states:

> **Commissions**
> The Commission Structure is as follows:
>
> The normal Agency commission rate will be set at **20%** of the UK Standard Price with exception given Procter & Gamble (US) and Masterfoods (US), who are key accounts. This commission value will be added to the UK Standard price then converted to U.S. Dollars to establish the U.S. sell price.

---

[3]Pursuant to the 2004 Agreement, PMR was given the right to "use the name HPS-US as a 'fictitious name' or 'dba.'" (Doc. 28-3 at 3.)

3

(*Id*. at 4.) Rates for site commissions, electrical panels, and installation work are also specifically delineated. (*Id*. at 4-5.) The Memorandum was not signed by PMR or O'Connor. (Doc. 27 at 7.)

The second Sales and Marketing Agreement, dated January 1, 2005, also states that commission rates were to be calculated based on the UK sales prices and lists lower percentage rates for sales on site commissioning and spare parts. (Doc 27-5 at 16.) As to the term, the second Sales and Marketing Agreement states that the agreement "continues for a period of twenty four **(24)** months." (*Id*. at 7.) It also provides that if PMR observed the terms and conditions of the agreement and met the sales target, HPS would "grant automatic renewal." (*Id*.) The 2005 Agreement was not signed by PMR or O'Connor. (Doc. 27 at 7.)

The parties do not appear to dispute that PMR continued to sell and market HPS's products and services until January 13, 2010, when PMR and O'Connor terminated the business relationship with HPS. Even so, it is unclear whether the parties operated under the 2004 Agreement beyond the initial twelve month term. Defendants allege that the 2004 Agreement automatically renewed because PMR exceeded its sales targets from 2004 to 2009. (Doc. 27 at 6.) HPS alleges that the 2004 Agreement terminated on or before January 29, 2005, after the initial twelve month term. (Doc. 28 at12-13.) According to HPS, the 2004 Agreement did not automatically renew based on sales targets; rather, HPS argues that it had to offer and PMR had to accept a renewal agreement with modified terms. (*Id*. at 13.) HPS argues that the 2005 Memorandum and second Sales and Marketing Agreement embodied those modified terms; however, HPS alleges that the parties could not come to an agreement. (*Id*. at 16.) HPS appears to argue that the parties operated under an oral agreement after the 2004 Agreement expired.

(Doc. 28 at 6-15.)

      B.    <u>Procedural History</u>

HPS initiated this action on March 1, 2010 by filing a complaint against O'Connor and PPS alleging trademark infringement, unfair competition, and cybersquatting in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); deceptive trade practices in violation of Chapter 4165 of the Ohio Revised Code; and trademark infringement and unfair competition in violation of Ohio law. (Doc. 1.) Specifically, HPS alleges that Defendants O'Connor and PPS used HPS trademarks without the permission, consent, or authorization of HPS.

On June 8, 2010, PMR intervened in this action as a party-defendant, claiming that the 2004 Agreement granted PMR and O'Connor the right to use HPS trademarks. (Doc. 17 at 1.) On June 18, 2010, Defendants collectively counterclaimed against HPS for breach of contract, unjust enrichment, conversion, and tortious interference with business relations.[4] (Doc. 18.) Defendants claim that HPS violated the 2004 Agreement by, among other things, withholding commissions owed to PMR. On December 28, 2010, Defendants moved for partial summary judgment on their breach of contract, unjust enrichment, and conversion counterclaims.

## II. STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the evidence, together with all inferences that can

---

[4]Because this motion was filed before Defendants' Motion to File Second Amended Counterclaims (doc. 30), the Court will construe the Motion for Partial Summary Judgment as embracing only those counterclaims in the First Amended Counterclaims (doc. 18).

permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. at 252.

**III.    ANALYSIS**

       A.    <u>Breach of Contract</u>

Defendants claim that HPS withheld commissions owed to PMR in violation of the 2004 Agreement. Defendants argue that there are no material factual disputes as to whether HPS breached the 2004 Agreement by withholding these payments. To prove a breach of contract under Ohio law, a plaintiff must establish the existence of a contract, performance by the plaintiff, breach by the defendant, and damage to the plaintiff. *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (1994). Defendants first argue that the 2004 Agreement governs the action at issue.

Defendants argue that the 2004 Agreement automatically renewed each year pursuant to the provision that provides: "[i]f the Agent has in all material respects observed the terms and conditions and met the agreed sales targets set . . . the Principal will grant automatic renewal . . . for a further term with such modifications as may be reasonably required to the terms and conditions by the Principal." (Doc. 27-4 at 4.) Because PMR met the agreed sales targets from 2004 to 2009, Defendants argue that the 2004 Agreement remained in effect through January of 2010. Next, Defendants argue that HPS breached the 2004 Agreement by withholding commission payments from PMR. It is not entirely clear when these payments were withheld, but the First Amended Counterclaims suggest that it was sometime in 2009. (*See* Doc. 18 at 5.) Defendants argue that HPS was required to pay PMR 20% of the U.S. sales price of all HPS products and services sold. Defendants argue that HPS failed to do so and has withheld "at least $287,258.60 in commissions." (Doc. 27 at 8.) Defendants then point to the deposition testimony of HPS principal Gilbert Murphy, wherein Murphy admits that HPS owes PMR between fifty and one hundred thousand dollars in commissions. (*See* Gilbert Dep. at 169.[5]) Based on this evidence, Defendants argue that summary judgment is warranted on the breach of contract counterclaim.

     HPS counters that summary judgment is inappropriate because disputed issues of fact remain as to whether the 2004 Agreement was in force during the relevant time frame. Although Defendants claim that the 2004 Agreement governed the parties' relationship through January of 2010, HPS alleges that the 2004 Agreement expired on January 29, 2005. HPS points out that the 2004 Agreement provides for renewal "with such modifications as may be reasonably

---

[5]Portions of Gilbert Murphy's deposition are filed at docs. 127-1 and 128-1.

required to the terms and conditions by the Principal." (Doc. 27-4 at 4.) HPS alleges that the parties could not agree on modified terms for a renewal period and, consequently, that the 2004 Agreement expired after the original twelve month term. Alternatively, Defendants argue that even if the 2004 Agreement automatically renewed, it only renewed for one additional twelve month term. In support of this argument, HPS points to a provision in the 2004 Agreement which states that "[i]f the sales targets set forth in Appendix 2 are met for the Initial Term the Principal will offer the Agent a second contract term of twelve **(12)** months (the "Renewal Term")." (Doc. 28-3 at 2.) In further support of their argument, HPS points to the deposition testimony of O'Connor, wherein he testified that he is "[n]ot positive" that the 2004 Agreement remained in place through 2010. (Doc. 28 at 11, citing O'Connor Dep. at 57.[6])

HPS also argues that disputed issues of fact remain as to the rate of commission. While Defendants argue that HPS was required to pay PMR 20% of the U.S. sales price of all HPS products and services sold, HPS argues that commissions were calculated as 20% of the UK standard price. HPS points to the deposition testimony of O'Connor, wherein he testified that he is "still pretty confused" about how the commission rate was calculated. (Doc. 28 at 4, quoting O'Connor Dep. at 90.) At best, HPS argues, disputed issues of fact remain as to the appropriate rate of commission. Based on the foregoing, HPS urges the Court to deny Defendants' motion.

Without expressing an opinion on the merits of this claim, the Court finds that there are numerous disputed facts which preclude summary judgment. First, the parties dispute which contract, if any, governs the present action. Defendants argue that the 2004 Agreement is the only contract existing between the parties. HPS argues that the 2004 Agreement expired in 2005

---

[6]Portions of Neil J. O'Connor's deposition are filed at doc. 28-2.

and that the parties operated under "a fluid set of terms that reflected the needs and interests of each side." (Doc. 28 at 6.) HPS submitted (1) evidence demonstrating that the parties were actively negotiating a new agreement in 2004 and 2005 and (2) testimony from both Murphy and O'Connor that raises doubts as to whether the 2004 Agreement remained in force beyond 2005. (*See* Murphy Dep. at 196; O'Connor Dep. at 57.) Second, the parties dispute the amount of commission owed to PMR and, specifically, the method of calculating PMR's commission rate. Defendants argue that PMR's commission rate was set at 20% of the U.S. sales price of all HPS products and services sold. HPS argues that the commission rate was set at 20% of the UK standard price, that this amount was then added to the UK standard price and converted to U.S. dollars "to form the total that the customer would pay." (Doc. 28 at 5.) Thus, there clearly are fact issues as to (1) whether the 2004 Agreement remained in effect during the relevant time frame and (2) how PMR's commission rate was to be calculated. These issues preclude summary judgment as a matter of law in Defendants' favor. The Court **DENIES** Defendants' Motion for Partial Summary Judgment on the breach of contract counterclaim (doc. 27).

      **B.**     **Unjust Enrichment and Conversion**

Because there are genuine issues of material fact as to the breach of contract counterclaim, there are also genuine issues of material fact as to the unjust enrichment and conversion counterclaims. The Court **DENIES** Defendants' Motion for Partial Summary Judgment on the unjust enrichment and conversion counterclaims (doc. 27).

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion for Partial Summary Judgment (doc. 27) is **DENIED**.

IT IS SO ORDERED.

                                                    ___s/Susan J. Dlott_____
                                                    Chief Judge Susan J. Dlott
                                                    United States District Court